In re WEAN INCORPORATED, Debtor.

BARTO TECHNICAL SERVICES, INC., formerly known as Wean Incorporated, Movant,

v.

PERSONS LISTED ON EXHIBIT A–I OF THE OBJECTION, Respondents.

Bankruptcy No. 93–22549–JKF. Motion No. DZ–8.

United States Bankruptcy Court, W.D. Pennsylvania.

July 5, 1994.

David Ziegler, Reed Smith Shaw & McClay, Pittsburgh, PA, for debtor.

David M. Fusco, Schwarzwald & Rock, Cleveland, OH, for United Steelworkers of America, AFL–CIO, CLC.

David W. Lampl, Sable, Makoroff & Gusky, P.C., Pittsburgh, PA, for Official Committee of Unsecured Creditors.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Bankruptcy Judge.

The matter before the court is Debtor's Amended Second Omnibus Objection to Claims. Various claims were resolved by orders of this court dated March 22, 1994, and May 20, 1994. The only remaining issue concerns the priority of certain claims for severance pay arising from the permanent closure and sale of Debtor's Youngstown, Ohio, plant. *See* Stipulation of Facts at Exhibit A, Docket Entry 702. Debtor contends that "severance pay claims at issue were based entirely on services performed prior to the Priority Period" and are not entitled to priority. Debtor's Memorandum of Law on Priority of Hourly Employee Severance Claims, Docket Entry 686; 11 U.S.C. § 507(a)(3). The United Steelworkers of America, AFL–CIO, CLC (hereafter "USWA"), takes the position that severance pay is earned throughout an employee's tenure with an employer. Therefore, the USWA argues, portions of severance pay attributable to services performed during the 90–day priority period are entitled to § 507(a)(3) priority. Portions attributable to postpetition services provided to Debtor are entitled to administrative priority under § 507(a)(1).[1] Those portions of the claims corresponding to the prepriority, prepetition period constitute unsecured claims. Having reviewed the parties' briefs and relevant case law we conclude that the USWA's position is correct.

Debtor and the USWA filed a Stipulation of Facts. The parties agree that on October 12, 1993, Debtor sold substantially all of its United States assets, including its Youngstown, Ohio, plant. It is not disputed that Debtor ceased operations of the Youngstown plant permanently on the same day. The parties are in accord that during the 90 days before the bankruptcy was filed, 125 hourly employees performed services for Debtor and that postpetition, until October 12, 1993, the date of the permanent shutdown, 120 hourly employees performed services for Debtor.[2]

The terms of the collective bargaining agreement dictate who is entitled to severance pay.[3] *Cf. Hardtke v. Exide Corp.,* 821 F.Supp. 1021, 1027 (E.D.Pa.1993) ("[a] court will go beyond the plain language of a benefits plan only if a determination is made that one or more of the terms are ambiguous"). In this case the relevant portion of the collective bargaining agreement is entitled "Section 18 Severance Allowance". In pertinent part, Section 18 unambiguously provides:

> **A. Conditions of Allowance**
>
> When in the sole judgment of the Company, it decides to (i) close permanently the operations of a plant or, (ii) discontinue

1. Responses also were filed by William T. Klim, Robert Brunet, Nicholas A. Taylor, John H. Mansfield, Thomas L. Wills, Charles A. Peters, the State Board of Equalization at Sacramento, California, and Ritter Engineering Company. The State Board of Equalization and Ritter Engineering Company had no objection. Taylor's and Mansfield's objections were resolved by an order of this court dated May 20, 1994. Klim, Peters and Wills are not listed on Exhibit A of the Stipulation of Facts but are on Exhibit B of the Debtor's Amended Second Omnibus Objection to Claims. In a telephone discussion with counsel for Debtor it was stated that Wills and Debtor agreed on the amount of his claim. Counsel for the USWA stated in a telephone conversation that Peters does not appear on the USWA's list. Counsel for Debtor's objection to the portion of Peters' claim related to the 401K plan was sustained at the hearing. Peters did not appear. The claims of Wills, Peters and Klim will be dealt with in court on July 11, 1994 and are not part of this Opinion and Order.

   Betty Wright filed an objection based on Ohio Workers' Compensation law. At a hearing held on May 20, 1994, on the Second Omnibus Objection, counsel for Debtor stated that her response was filed as a cautionary measure inasmuch as the matter is before the Tax Court.

2. The parties also stipulate that, except for two employees, "none of Debtor's hourly employees are entitled to a greater severance allowance than they would have been entitled to had the permanent shutdown been declared ninety days prior to the filing of Debtor's petition for relief or on the date the petition was filed." Stipulation of Facts at ¶¶ 3, 4, 5, and 7.

3. We note that the collective bargaining agreement was rejected effective December 31, 1993, two months after the sale. Inasmuch as Debtor was not in business after October 12, 1993, and in light of the terms of the collective bargaining agreement, we use October 12, 1993, as the operative date for calculation of severance benefits. *See generally Kotrosits v. GATX Corp. Non–Contributory Pension,* 970 F.2d 1165 (3d Cir.), *cert. denied* — U.S. —, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992), and cases cited therein.

permanently a department, or a substantial portion thereof, and terminate the employment of individuals, an employee whose employment is terminated, either directly or indirectly as a result thereof because he was not entitled to other employment with the Company under the provisions of Section 13—Seniority, of this Agreement, shall be entitled to a severance allowance in accordance with and subject to the following provisions. Neither the transfer of certain work from one plant to another plant, in the same seniority unit, nor the peranent [sic] closing of one plant with the operations formerly performed in the closed plant to be performed in another plant of the same seniority unit, shall be construed as being covered by this Section but instead shall be considered as a layoff situation covered by Section 13—Seniority, of this Agreement.

*See* portions of collective bargaining agreement attached to the Stipulation of Facts, Docket Entry 702.

■ There are two types of severance pay claims: payment at termination of employment in lieu of notice and payment at termination based on length of employment. *In re Roth American, Inc.,* 975 F.2d 949, 957 (3d Cir.1992). The severance pay at issue is of the second type. Section 18 at paragraphs B and C provides that eligibility for and the amount of severance pay turn on length of service. Debtor cites *Roth American* for the proposition that this type of severance pay claim has administrative priority only to the extent that it is based on postpetition services to a debtor. *Roth American* holds that that *portion* of the severance pay claims attributable to work performed postpetition constitutes an administrative claim. It does not provide, as Debtor argues, that the employees must perform postpetition all services which entitle them to severance pay. *See also In re Public Ledger,* 161 F.2d 762 (3d Cir.1947). It is undisputed that 120 hourly employees performed services for Debtor postpetition until Debtor's operation of the plant closed permanently. Stipulation of Facts at ¶ 5. To the extent that these employees were eligible for severance pay when their employment with Debtor ceased, the severance pay attributable to the postpetition

period must be given administrative priority. 11 U.S.C. § 507(a)(1).

■ We have also examined the arguments and case law concerning the priority claims. We conclude that the portion of severance pay claims attributable to services performed during the 90–day priority period is entitled to priority treatment under § 507(a)(3). *See In re Jeannette Corp.,* 118 B.R. 327 (Bankr.W.D.Pa.1990); *In re Levinson Steel Company,* 117 B.R. 194 (Bankr. W.D.Pa.1990). Section 507(a)(3) refers specifically to severance pay claims which are "earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first." 11 U.S.C. § 507(a)(3)(A). Priority claims under § 507(a)(3) earned within the 90–day period are not payable in full, however, but only to the extent of $2,000. 11 U.S.C. § 507(a)(3)(B). The $2,000 limit covers severance pay as well as wages, salaries, commissions, and vacation pay. Prepetition amounts in excess of $2,000 constitute unsecured claims. In this case, Debtor was authorized previously to pay wages and/or vacation pay to its hourly employees, not to exceed the $2,000 priority amounts. Thus, any priority wage payments already made must be subtracted from the $2,000 maximum priority before additional sums are paid for priority severance claims. The balance of the severance pay claims for prepetition services is unsecured.

■ In this case, some of the employees were hired, with no interruption in employment, by the entity that bought Debtor's assets. We find that the noninterruption of work does not invalidate the employees' entitlement to severance pay from Debtor. In *Ulmer v. Harsco Corp.,* 884 F.2d 98 (3d Cir.1989), Harsco's employee welfare benefit plan did not contain a unified severance policy but its practice when divisions were sold was to make severance payments when its terminated employees were not hired by the purchaser or when they were hired by the purchaser but later terminated. The district court had held that because the employees continued to work and their work place remained the same, they had not been severed from their former employment and were not entitled to severance pay. The court of ap-

peals reversed, finding that the term "continuing employment" used in Harsco's plan meant employment with the division that had been sold. 884 F.2d at 102. The court of appeals also found that, although the employees who had been hired by the purchaser remained in the same work place, the plan was not intended to primarily protect a work place-employee relationship.

In the matter at hand, the terms of Section 18 of the collective bargaining agreement state that termination of employment, discontinuance of a department or a substantial portion thereof, or cessation of operations of a plant triggers the entitlement to severance pay. The permanent plant closure, for purposes of severance pay calculation, occurred on October 12, 1993, the date Debtor's assets were sold and Debtor ceased doing business.[4] Section 18 does not apply to the situation in which work is transferred from one plant to another in the same seniority unit nor does it apply in the event that work performed in a plant that is closed is transferred to another plant of the same seniority unit. In the instant case neither exception applies inasmuch as work was not transferred to another plant of Debtor's but to another company. The situation is similar to that in *Ulmer v. Harsco Corp.*

Although the employees may choose layoff status under some circumstances enumerated in Section 18, paragraph E, the result does not change. *Hardtke v. Exide Corp.,* 821 F.Supp. 1021 (E.D.Pa.1993), involved circumstances similar to those in the case at bar. Exide's Separation Plan disqualified an employee from receiving severance pay if the employee was offered "comparable ... employment by the Company or any or [sic] its subsidiaries or affiliates". *Id.* at 1027. Exide contended that severance pay was not due its former employees because they were hired by the purchaser of the division that was sold. Exide argued that the purchaser fell within the meaning of the terms "Company ... subsidiar[y], or affiliate[ ]". The court concluded that the plan defined "Company" as Exide and that all references in the plan to "Company" could be reasonably un-

derstood to refer only to Exide. Therefore, because their employment with Exide was terminated, the employees were entitled to severance pay. In the instant matter the record establishes that "employment with the Company" as stated in Section 18, paragraph E, means employment with Debtor and does not refer to a purchaser of Debtor's business.

In light of the similarity of Section 18 to those plan provisions at issue in *Harsco* and *Exide,* we conclude that, notwithstanding the fact that some of the claimants continued to be employed by the purchaser of Debtor's assets, they are entitled to severance pay under the terms of the collective bargaining agreement, which agreement is not ambiguous. We also find that the claims must be apportioned according to that part of the severance pay that each employee earned so that the postpetition services will afford entitlement to a partial administrative claim and the services within the priority period will afford a priority claim, not to exceed $2,000 per employee, after appropriate deductions are made for priority wage and/or vacation payments already made.

An appropriate order will be entered.

### ORDER

And now, to-wit, this **5th** day of **July, 1994,** for the reasons set forth in the foregoing Memorandum Opinion and in accordance with the limitations set forth therein, it is **ORDERED** that Debtor's Amended Second Omnibus Objection to Claims of hourly employees for severance benefits is **OVERRULED.**

It is **FURTHER ORDERED** that the hourly employees' claims for severance pay shall be paid in accordance with paragraph 8 of the Stipulation of Facts at Docket Entry 702 submitted by Debtor and the United Steelworkers of America, AFL–CIO, CLC.

4. Section 18 paragraph E permits employees to choose layoff status for a specified period of time but there is no allegation that this paragraph applies. We note that it refers to an employee obtaining other employment within the company, but this provision is not applicable because Debtor has ceased operating the plant. Even if it did apply, it would not alter the result in this case. *See* discussion of *Ulmer v. Harsco Corp., supra,* and *Hardtke v. Exide Corp., infra.*